ORIGINAL

FILED
JUL 3 2008
U.S. COURT OF
FEDERAL CLAIMS

Joseph A. Boyle, Esq.
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, NJ 07054
Attorneys for Plaintiff
LUK, Inc.

**IN THE UNITED STATES COURT
OF FEDERAL CLAIMS**

| | |
|---|---|
| **LUK, INC.**<br>Plaintiff,<br>**v.**<br>**UNITED STATES OF AMERICA,**<br>Defendant. | 08-488 C<br>**NO.** ________<br><br>**COMPLAINT** |

Plaintiff LUK, Inc. ("LUK" or "Plaintiff"), by and through its attorneys Kelley Drye & Warren LLP, for its Complaint against defendant United States of America ("Defendant") alleges as follows:

**THE PARTIES**

1. Plaintiff is a corporation organized under the laws of the State of New York, with its principal place of business located in Albany, New York. Plaintiff's address is 80 State Street, Albany, New York 12207.

2. Defendant is the United States of America, acting through the United States Army Corps of Engineers, which is the contracting agency within the "disputes clause" contained in the Contracts referred to herein.

## JURISDICTION AND VENUE

3. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1491.

## RELIEF SOUGHT

4. This case presents a contract claim arising out of Defendant's failure to fully pay Plaintiff for certain repair and maintenance work pursuant to a written lease.

5. Plaintiff seeks reimbursement for carpet installation and removal as provided by the Lease under the Contract Disputes Act, 41 U.S.C. § 601 *et seq*.

### The Lease

6. On or about August 28, 1985, Plaintiff entered into an Agreement to Lease for 1,000 housing units, at seven sites in the area of Ft. Drum, New York. The Agreement to Lease was subsequently transferred to the U.S. Army Corps of Engineers, New York District (the "Government" or "Army").

7. Consistent with the terms of the Agreement, on February 1, 1988, the Government entered into leases with seven different subsidiaries of Plaintiff, namely: Philadelphia Housing Associates, Clayton Housing Associates, Gouverneur Housing Associates, Academy Housing Associates, Copenhagen Housing Associates, Eastern Housing Associates, and Arsenal Housing Associates (collectively the "Owner") for the housing units at the seven sites. The terms of each of these leases are identical, and all of the subject leases are referred to collectively as the "Lease."

8. The Government subleases the units to military personnel or Department of Defense civilians referred to in the Lease and related documents as "Occupants."

9. Exhibit "C" to the Lease is the Maintenance, Repair and Operational Services Standards Annex (the "Annex"), which details many of the rights and responsibilities of the Government, Occupants, and Owner, pursuant to the Lease. Section C.1.s provides that

certain damages to a housing unit or other improvements within the project which are beyond normal wear and tear and are caused by the Government or an Occupant, his dependents, or invited guests, and which are not corrected by the Government or the Occupant, shall be repaired by the Owner, and the cost of such repairs shall be billed to the Government.

**Task Times/Price List**

10. Section C.1.t of the Lease provides for the establishment of a list of cleaning and repair costs for dwelling unit components (the "List of Repair Costs").

11. That Section also contains a formula for establishing the price for each item on the List of Repair Costs. Man hour requirements for each task are derived from applicable Engineered Performance Standards (EPS) Manuals. Those man hour requirements are to be multiplied by the Department of Labor Service Contract Act wage determination rate, plus materials at wholesale cost, plus reasonable overhead and profit.

12. That Section further provides that the List of Repair Costs will be subject to change annually or from time to time by mutual agreement of the Owner and the Government.

13. Pursuant to Section H.3.b of the Lease, the Government is required to pay the Owner for "reimbursement work which is authorized by Government Work Authorizations ***and which is billed in accordance with the approved List of Repair Costs***." (emphasis added).

14. The aforesaid List of Repair Costs is a "fixed price contract with prospective price redetermination" as defined by Federal Acquisition Regulation 16.205-1.

15. Pursuant to Paragraph C.1.t. of the Annex, the Owner and the Government did establish an approved List of Repair Costs on or about May 1, 1991. Consistent with the Annex, the List of Repair Costs was based upon the latest published edition of the applicable EPS Manuals to determine man hour requirements which were the multiplied by the Department

of Labor Service Contract Act Wage Determination Rate, plus materials at wholesale cost, plus reasonable overhead, plus profit.

16. On January 24, 2002, Plaintiff and the Government entered into an Agreement in settlement of Appeals 50659, 52368 and 52793 filed by Plaintiff with the Armed Services Board of Contract Appeals ("Settlement Agreement"). (A copy of the Settlement Agreement is attached hereto as Exhibit A).

17. The Settlement Agreement provided, in part, that "future material prices billed by LUK for repair of occupant damage will be at the full price list price according to the then current price list established under Lease Exhibit C, Section C.1.t., not at the actual price." (*See* Exh. A, Settlement Agreement at ¶ 7).

18. At the time of the Settlement Agreement, LUK was responsible for removing and installing carpeting at all of the Units.

19. On September 11, 2002, the Army accepted LUK's proposal of the July 25, 2002 Price List as the then current price list.

20. In October 2002, the Army assumed control of the carpet installation and removal duties from LUK and chose to replace all carpeting itself.

21. In November 2003, the Army again gave to LUK the responsibility for removing and installing carpeting for the Units.

22. On September 26, 2003, the Army accepted LUK's proposed June 30, 2003 price list except with respect to the carpet installation labor rate for which the Army improperly began using its own price list, with much lower rates/times than the agreed upon price list, to calculate the cost of carpet installation and directed LUK to follow the dispute procedures to challenge this decision.

23. On October 29, 2004, the Army accepted LUK's proposed July 31, 2004 price list except for carpet shampoo costs, and improperly continued to use its own arbitrary carpet installation labor rates rather than LUK's proposed rates and directed LUK to follow the dispute procedures to challenge this decision.

24. On August 30, 2005, the Army accepted LUK's proposed June 30, 2005 price list, but again excluded shampoo costs and improperly continued to use its own arbitrary carpet installation labor rates rather than LUK's proposed rates and directed LUK to follow the dispute procedures to challenge this decision.

25. On November 29, 2006, the Army Accepted LUK's proposed October 15, 2006 price list, but once again excluded shampoo costs and improperly continued to use its own arbitrary carpet installation labor rates rather than LUK's proposed rates and directed LUK to follow the dispute procedures to challenge this decision.

26. LUK continued to remove and install carpeting in all of the Units through January 1, 2008, the date in which the Lease expired, to approximately March 25, 2008, the date in which LUK sent its last invoice to the Army.

27. The Army continued to use its own arbitrary carpet installation labor rates for 2007 and 2008.

28. From November 2003 to on or about March 25, 2008, despite approving LUK's annual price list submissions and/or accepting LUK's removal and installation of carpeting, the Army has not paid LUK at the proposed price list amounts with respect to carpet installation labor rates and shampoo costs. Instead, it has reimbursed LUK at its arbitrarily reduced price list amounts/rates for these items.

29. The Army, therefore, has been under-reimbursing LUK for carpet installation and removal since November 2003 to on or about March 25, 2008.

**Preventative Maintenance Carpeting ("PM Carpeting")**

30. In the Settlement Agreement, the parties agreed that the material prices billed by LUK "will not be paid on a prorated basis." (*See* Exh. A, Settlement Agreement at ¶ 7).

31. Beginning in March 2002, however, the Army instituted a new policy that carpet that is 8 years old must be replaced, regardless of its condition, as preventative maintenance, and that LUK would not be reimbursed for removing and replacing this carpet.

32. In so doing, the Army has been *de facto* prorating the value of the carpet to zero in violation of the Settlement Agreement.

33. The Army should reimburse LUK for all the PM Carpeting it has replaced from 2002 to 2006 and for which it has not paid LUK.[1] The Army has never provided LUK with a reason for instituting its policy of replacing the carpet (regardless of condition) when it reaches a certain age.

34. LUK should be reimbursed for the time, money and materials it has spent in replacing the PM Carpeting.

35. The Army has refused to reimburse LUK for the replacement of PM Carpeting dating from 2002 through August 17, 2006.

**Demand for Contracting Officer's Decision**

36. On December 19, 2006, Plaintiff made a Demand for a Contracting Officer's Decision: (i) finding that the agreed upon task times/price lists constitute the proper

[1] LUK ceased its preventative maintenance work and sent its last invoice for PM Carpeting to the Army on August 17, 2006

amounts of labor costs for all price list items that the Army should pay to LUK for carpet installation and removal going forward, and should be implemented retroactively to November 2003; (ii) ordering the Army to reimburse LUK in the amount of $358,647.62 for the task times/price list items for which it has been under-reimbursing LUK since November 2003; and (iii) ordering the Army to reimburse LUK in the amount $176,565.42 for the replacement of PM Carpeting for which it has under-reimbursed LUK from 2002 to August 17, 2006. (A copy of the Demand for a Contracting Officer's Decision is attached hereto as Exhibit B).

37. On July 5, 2007, the Contracting Officer issued a decision denying Plaintiff's request, a copy of which is attached hereto as Exhibit C.

38. Since Plaintiffs Demand for a Contracting Officer's Decision the Army continued to under-reimburse Plaintiff for its services.

**FIRST COUNT**
**(Breach of Contract)**

39. Plaintiff repeats and realleges all of the allegations contained in paragraphs 1 through 38 above as if set forth herein at length.

40. Attached to the Complaint is a summary spreadsheet detailing the yearly under-reimbursed amounts for PM Carpeting and carpet removal and installation, with the supporting spreadsheets providing the under-reimbursed amounts of the task times/price list items and PM Carpeting for the years 2003 through 2008.[2] (See Exhibit D at Tabs 1, 2, 3, 4, 5, 6, and 7 respectively.)

41. The total amount due from the Government for Calendar Year 2003 for under-reimbursement of the task times/price list items is $17,929.22.

2 Supporting spreadsheets for PM Carpeting end in August 2006, the last month in which LUK billed the Army for PM Carpeting.

42. The total amount due from the Government for Calendar Year 2004 for under-reimbursement of the task times/price list items is $122,088.30.

43. The total amount due from the Government for Calendar Year 2005 for under-reimbursement of the task times/price list items is $127,394.79.

44. The total amount due from the Government for Calendar Year 2006 for under-reimbursement of the task times/price list items is $142,869.89.

45. The total amount due from the Government for Calendar Year 2007 for under-reimbursement of the task times/price list items is $184,232.98.

46. The total amount due from the Government for Calendar Year 2008 for under-reimbursement of the task times/price list items is $235,992.50.

47. The total amount due from the Government for Calendar Year 2002 for non-payment of the replacement of PM Carpeting is $52,114.62.

48. The total amount due from the Government for Calendar Year 2003 for non-payment of the replacement of PM Carpeting is $15,751.41.

49. The total amount due from the Government for Calendar Year 2004 for non-payment of the replacement of PM Carpeting is $73,747.03.

50. The total amount due from the Government for Calendar Year 2005 for non-payment of the replacement of PM Carpeting is $26,994.23.

51. The total amount due from the Government for Calendar Year 2006 for non-payment of the replacement of PM Carpeting is $7,958.13.

52. The total amount due from the Government for Calendar Years 2002 to 2008 for under-reimbursement of the task times/price list items and for non-payment of the replacement of PM Carpeting is $1,007,073.10.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LUK, Inc. prays for a judgment:

(a) against Defendant awarding money damages in the sum of $52,114.62 for non-payment for the replacement of PM Carpeting during Calendar Year 2002, plus interest from the date of each non-payment;

(b) against Defendant awarding money damages in the sum of $17,929.22 for under-reimbursement of the task times/price list items during Calendar Year 2003, plus interest from the date of each underpayment;

(c) against Defendant awarding money damages in the sum of $15,751.41 for non-payment for the replacement of PM Carpeting during Calendar Year 2003, plus interest from the date of each non-payment;

(d) against Defendant awarding money damages in the sum of $122,088.30 for under-reimbursement of the task times/price list items during Calendar Year 2004, plus interest from the date of each underpayment;

(e) against Defendant awarding money damages in the sum of $73,747.03 for non-payment for the replacement of PM Carpeting during Calendar Year 2004, plus interest from the date of each non-payment;

(f) against Defendant awarding money damages in the sum of $127,394.79 for under-reimbursement of the task times/price list items during Calendar Year 2005, plus interest from the date of each underpayment;

(g) against Defendant awarding money damages in the sum of $26,994.23 for non-payment for the replacement of PM Carpeting during Calendar Year 2005, plus interest from the date of each non-payment;

(h) against Defendant awarding money damages in the sum of $142,869.89 for under-reimbursement of the task times/price list items during Calendar Year 2006, plus interest from the date of each underpayment;

(i) against Defendant awarding money damages in the sum of $7,958.13 for non-payment for the replacement of PM Carpeting during Calendar Year 2006, plus interest from the date of each non-payment;

(j) against Defendant awarding money damages in the sum of $184,232.98 for under-reimbursement of the task times/price list items during Calendar Year 2007, plus interest from the date of each underpayment;

(k) against Defendant awarding money damages in the sum of $235,992.50 for under-reimbursement of the task times/price list items during Calendar Year 2008, plus interest from the date of each underpayment; and

(l) For such other and further relief as the Court deems equitable and proper.

Dated: July 2, 2008

Respectfully submitted,

By: ______________________

Joseph A. Boyle, Esq.
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, NJ 07054
(973) 503-5900
(973) 503-5950
Attorneys for Plaintiff
LUK, Inc.

**CERTIFICATION OF MICHAEL UCCELLINI**

I hereby certify, pursuant to the Contracts Disputes Act, 41 U.S.C. §§ 601-613 and Article XVI (the Disputes Clause) of the leases entered into between LUK and United States Government, that:

(a) LUK's instant claim is made in good faith;

(b) the supporting data are accurate and complete to the best of LUK's knowledge and belief;

(c) the amount requested accurately reflects the contract adjustment for which LUK believes the United States Government is liable; and

(d) I am duly authorized to certify the claim on behalf of LUK.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 2, 2008

Michael Uccellini
On behalf of LUK, Inc.