RECEIVED
10 AUG

DEPARTMENT OF THE ARMY
NEW YORK DISTRICT, CORPS OF ENGINEERS
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, N.Y. 10278-0090

REPLY TO ATTENTION OF
Office of Counsel

JUL 05 2007

SUBJECT: Lease Nos. DACA65-85-9-0001 and DACA65-85-9-0002, 801 Housing, Fort Drum, New York

Walter F. Uccellini, President
LUK, Inc.
80 State Street, Eighth Floor
PO Box 799
Albany, New York 12201

Dear Mr. Uccellini:

Reference is made to your counsel's letter, dated December 19, 2006 (Tab C).[1] Your counsel, on your behalf, requests the sum of $535,213.04, plus interest, for Government underpayment of carpet replacement from 2002 to August 2006. He also requests a finding by the Contracting Officer as to "the proper amounts of labor costs for all price list items" owed to LUK, Inc. related to carpet installation and repair since November 2003.

Based upon the available record, the following are my Findings of Fact, Analysis, and Decision.

## Findings of Fact

1. The U.S. Army Corps of Engineers, Norfolk District, issued Requests for Proposals ("RFP") DACA65-85-9-0001 and DACA65-85-9-0002 (Sample Tab D), on December 20, 1984. Proposals were sought for construction, lease, maintenance and operation of units of Section 801 family housing in the vicinity of Fort Drum, New York.

2. The following provision of the Request for Proposals is relevant to this claim.

[1] Tabs 1 and 2 are reserved for the Notice of Appeal and Contracting Officer's Decision in the event of appeal. Exhibits are not attached but will be forwarded in the event of an appeal.

SECTION II - DESIGN/CONSTRUCTION CRITERIA

B. SPECIFIC CRITERIA

Interiors

Carpeting, if provided, shall be 100% soil-hiding nylon and shall conform to consumer product safety commission FF 1-70. It shall have flame propogation [sic] index of less than 4.0 when tested in accordance with UL 992 or a minimum average critical radiant flux of 0.5 watts per square centimeter when tested in accordance with federal test standard 372.

3. In February of 1985, LUK, Inc. ("LUK", "Developer", or "Owner") submitted a proposal in response to each RFP. Sample Tab E.

4. The following provisions of the LUK Proposal are relevant to this claim.

I. EXECUTIVE SUMMARY

...

The Proposers have selected quality, durable, and maintainable material, equipment, products, and other features that reflect lower life cycle costs (Section III.2), when combined with a high quality site and unit design, and engineering (Section III.2) provide the best maintenance, repair, and operating services during the 20 year lease term (Section II.2). The proposers have made every effort to provide a site and unit design that awards the maximum quality points (Section I.1) at the least cost to the Government.

...

PROPOSAL SCORING SUMMARY

...

V. Dwelling Unit Engineering and Specifications Maximum 100 Points

...

K. Maintainability (15 Points)

The proposed materials [sic] finishes and systems are in compliance with HUD MPS and durable in nature (III.2 Description of Materials).

5. After evaluation of the proposals and negotiations, on August 28, 1985, LUK and the Government entered two Agreements to Lease (Sample Tab F) for 1000 housing units at seven sites in the area of Fort Drum.

6. The Agreements to Lease were subsequently transferred to the U.S. Army Corps of Engineers, New York District.

7. The following provisions of the Agreements to Lease are relevant to this claim.

> 1. Agreement to Lease Premises. The parties hereto agree that if Developer constructs and completes certain residential buildings, structures and other improvements (hereinafter referred to as "Improvements") which among other things will be in accordance with the criteria and schedule attached hereto as Exhibits "B" and "C", and by this reference made a part hereof, the Government will enter into a lease with the Developer for use of the Premises for family housing purposes, subject to the terms, provisions and conditions hereinafter set forth.
>
> 2. Consideration for Construction of Improvements. The Developer shall not be entitled to receive from the Government and the Government shall not be obligated to pay to the Developer any monetary consideration for the construction of the Improvements contemplated in this Agreement. It is understood by the parties that such Improvements shall be and will remain property of the Developer during the duration of this Agreement to Lease.

8. Consistent with the terms of the Agreements to Lease, on February 1, 1988, the Government entered into Leases with seven different subsidiaries of LUK for the housing units at the seven sites. Sample Tab G.

9. The following Articles of the Leases are relevant to this claim.

VIII MAINTENANCE, REPLACEMNTS, REHABILITATION, REDECORATION, AND REPAIRS

The Owner, at its sole cost and expense, shall operate and perform all maintenance, repairs, replacements, rehabilitation and redecoration of the Premises in accordance with the requirements, procedures, and criteria set forth in Exhibit "C" of this Lease (Maintenance, Repair and Operational Services Standards Annex).

EXHIBIT C MAINTENANCE, REPAIR AND OPERATIONAL SERVICES STANDARDS ANNEX

. . .

B. DEFINITIONS

. . .

Work Authorization: An official document issued by the Government for the accomplishment of work by the Owner and which is used to verify entitlement for reimbursement.

Work Order: A medium which is used by the Owner to document all maintenance, repair, or renovation work accomplished by the Owner in accordance with the terms of this lease agreement.

C. RESPONSIBILITIES

1. Owner Responsibilities:

The Owner is responsible for the management, repair, replacement, work reception, supervision, procurement, supply, transportation, equipment, tools, accounting, administrative services, and all operations required to support the housing site.

. . .

s. Damages Caused by Occupants:

Damages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the Government or an occupant, his dependents, or invited guests, which are not corrected by Government or occupant, shall be repaired by the Owner. The cost of such repairs shall be billed to the Government. ... Repair of damages which occur to the units or other improvements that cannot be attributed to the government, his [sic] agents, officers, occupants, their dependents, or invited guests, shall be accomplished by the owner at no cost to the Government.

t. <u>List of Repair Costs</u>:

The Owner shall, with the approval of the Government, establish a list of cleaning and repair costs for dwelling unit components which will establish the normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear. The list of repair costs will be based upon the latest published edition of applicable Engineered [sic] Performance Standards (EPS) Manuals (Army TB 420-series, Navy NAVFAC P-700 Series, Air Force AFM 85-series) which will be utilized to estimate manhour requirements. These manuals will be provided to the Owner upon request. The manhour requirements will be multiplied by the Department of Labor Service Contract Act Wage Determination rate plus materials at wholesale cost plus reasonable overhead and Profit [sic]. This list will be provided at the time of the pre-performance conference. Such a list will be subject to change annually or from time to time by mutual agreement of the Owner and the Government.

2. <u>Government's Responsibilities</u>:

...

c. Housing Project Administration:

The Government is responsible for the day-to-day administration at the housing site to include the following:

...

10) Notify Owner via work authorization of occupant-caused damages or conditions requiring correction or cleaning and reimbursing Owner for accomplishment of same.

11) Approve annual schedule or repairs, list of repair costs for occupant damages and printed occupant instructions as submitted by the Owner.

10. From the dates that leases were entered with LUK and the other developers of 801 housing, there have been periodic disputes regarding the reimbursement to be paid by the Government to developers for repairs to a housing unit that has been damaged by the occupant or another party for whom he is responsible (a dependent, pet or guest). These disputes have usually centered on carpet, because of the frequency and expense of its replacement.

11. On January 24, 2002, LUK and the Government entered an Agreement in settlement of Appeals 50659, 52368, and 52793 filed by LUK with the Armed Services Board of Contract Appeals (ASBCA). Tab C, Ex. 1.

12. The Agreement provided, in part, that materials provided by LUK for repair or replacement of occupant damages will be reimbursed by the Government at the full price list established under the Lease with no allowance ("proration") for depreciation. Tab C, Ex. 1, page 6.

13. On September 11, 2002, the Government issued its acceptance (Tab C, Ex. 2) of the price list submitted by LUK on or about July 25, 2002.

14. The following year, after reviewing the price list that had been updated and submitted by LUK on or about June 30, 2003, Ms. Janet Delosh of the Fort Drum Directorate of Public Works requested on July 23 that LUK "submit justification for labor hours to remove and install carpet and pad" and invited LUK to "give me a call" with any questions. Tab H.

15. LUK's representative informed Ms. Delosh on July 28, 2003 (Tab I) that there was, in her words, "a slight problem" with the request, in that she had "no authorization to change a previously accepted and time approved [sic] to complete a task involving carpet" but offered to "forward your request on to Albany".

16. On July 31, 2003, Ms. Delosh pointed out that the Government had the "option to audit any item at any time" and requested LUK provide the requested information by August 4, 2003. Tab I.

17. On August 27, 2003, another LUK representative informed the DPW that LUK would submit the needed information by September 4, 2003, and inferred that the requested "installation times" would be based on "the new Means Manuel" [sic].

Means Manual not in the leas

18. When no response was received by September 12, 2003, Mr. James Pierce of the DPW notified LUK that if LUK failed to either justify or modify its carpet installation times by September 19, DPW would do so unilaterally. Tab J.

19. On September 19, Mr. Frank Carpenter of LUK informed the DPW that LUK disagreed with the Means Manual's labor times and regarded any DPW unilateral changes to the price list as "a breach of the lease". Tab J.

20. On September 26, 2003, the Government issued its acceptance (Claim, Tab 3) of the price list that had been updated and submitted by LUK on or about June 30, 2003.

21. However, while the hourly rate for carpet replacement was acceptable to the DPW, the number of hours proposed for replacement was found excessive without either adjustment or justification being furnished by LUK. Similarly, the hourly rate for shampoo of existing carpet was excessive.

22. On December 19, 2003, Mr. Carpenter submitted to Ms. Marcia Brown of the DPW a proposal for "new labor costs for the carpet/pad replacement", stating that they came "form [sic] the Means Residential Repair and Remodeling Costs 2003" and were "somewhat lower than we were using when the Army changed the calculation". Tab K.

23. Ms. Brown responded to LUK's latest proposal on January 8, 2004. Tab L. Ms. Brown pointed out that the true dispute concerned the task time, not labor rates. She stated that the times furnished by LUK were "not even close" and that DPW would continue to use the "Means Manual time for tasks plus one half hour for removal" until advised to alter its calculations by the Contracting Officer.

24. That same date, Mr. Carpenter expanded on his earlier proposal. Tab M. He explained that LUK's proposal was to use a basic task time of .028 hours per square foot for carpet replacement, with an additional 2.5 hours on every job (regardless of size unless larger than 397 square feet) for preparation, disposal and travel. Thus, using the rate desired by LUK, carpet replacement of a room of 397 square feet would require a total of 13.66 (.028 X 397 + 2.5) hours of labor.

25. The Fort Drum DPW responded to Mr. Carpenter's proposal on February 10, 2004. Tab N. The Government's "bottom line" was described as .028 hours per square foot for carpet removal and installation and .5 hours per job for sweeping the sub-floor and vacuuming the carpet.

26. On October 29, 2004, and again on August 30, 2005, the Government accepted the price lists submitted by LUK on or about July 31, 2004, and June 30, 2005, respectively, with the exception of the prices proposed by LUK on each occasion for carpet shampooing. Claim, Tabs 4 and 5.

27. On September 19, 2005, counsel for LUK wrote the Contracting Officer (Tab O) to "reiterate LUK's year old request for a contracting officer's decision regarding the proper task times/price list to be used to calculate the cost of carpet installation and removal". He requested the Contracting Officer affirm that (a) "LUK's proposed task times/price list for the "Challenged Items" [sweeping, vacuuming, load/unloading, disposal and travel] are proper" and that (b) LUK be reimbursed $144,570.69 for underpayment

of "Accepted Items" [removal and installation of carpet and padding] since November 2003.

28. After a through search of Government offices, on November 28, 2005, the Contracting Officer informed LUK's counsel that neither she nor the Fort Drum DPW had received a valid request for a Contracting Officer's Decision on any of these matters. Tab P.

29. On November 29, 2006, the Government, in essence, repeated its 2003 acceptance action by granting LUK's price list of October 15, 2006 except for the hours claimed by LUK for carpet replacement and the cost of carpet shampoo. Claim, Tab 6.

30. On December 19, 2006, LUK's counsel filed the instant claim, certified by LUK's President, seeking $535,213.04 for the Government's alleged underpayment, during the years 2002 to 2006, under work authorizations for carpet replacement and cleaning made to 801 housing units due to occupant damage. Tab C.

Conclusion

The Owner seeks the sum of $535,213.04 for alleged Government underpayments made between 2002 and 2006 when reimbursing Owner for either replacement or cleaning of carpet in Section 801 family housing units necessitated by damage caused by the actions of an occupant (or his dependent, pet or guest).

The nature of the dispute is clear. When an 801 housing unit is damaged by the occupant (or his dependent, pet or guest), the Government is obligated by the Leases to pay LUK for the cost of repairs based on the formula Cost of Materials + Cost of Labor + Overhead + Profit. The labor component is calculated by multiplying the manpower requirements ("task times") by the hourly rate set by the United States Department of Labor' Wage and Hour Division under authority of the Service Contract Act of 1965. Payment is to be calculated consistent with the price list negotiated between the Owner and the Government. The current issue is the correct task times for carpet cleaning and replacement.

At the time of lease signing, the determination of task times was envisioned as straightforward. The parties

were to look to the Engineering Performance Standards (EPS) Manuals. It was long ago discovered that these Standards were either not available or not usable. The parties then agreed to utilize the most practical sources, Means Manuals ("Means") when available or a Means-type guidebook when unavailable. The fact that the parties were able to base all price list task times until 2002 (and all but two task times after that date) on these sources without significant problem demonstrates the astuteness of this approach. The most appropriate course of conduct in the present context is to again adopt the standards found in Means or a Means prototype.

On several occasions Government representatives, most notably Ms. Delosh and Ms. Brown, have proposed that the parties mutually consult Means or a similar source and adopt outright or, at least, begin negotiations on the basis of the figures found therein. LUK's personnel seemingly agreed with this methodology but presented figures "not even close" to those found in Means. The instant claim, likewise, extensively documents the amounts allegedly underpaid and the underlying communications. It, however, nowhere presents the most obvious supporting factual documentation of entitlement - a citation to Means or a Means equivalent that presents a firm "task time" for the tasks in dispute. To the contrary, DPW employees have repeatedly referenced Means and similar sources to justify their findings of erroneous overstatement on the part of LUK's figures. LUK has, so far, failed to posit an authority equally credible as Means or the originally conceived EPS Manuals. Thus, there is no support for its position or for the instant claim.

In addition, it is axiomatic that one who makes a claim against the Government has the burden of proof to prove his entitlement to the relief sought. The burden does not rest with the Government to prove the claimant's lack of entitlement. LUK here has claimed entitlement to reimbursement for work performed by alleging lack of support for the Government's position. There is, however, no affirmative proof creating entitlement in LUK. If for no other reason, this fact alone suffices as grounds for denial of the claim.

In view of the above, and the record as a whole, the Owner's claim is denied in its entirety.

Decision

The Owner's claim for $535,213.04 is hereby denied.

This notice constitutes the final decision of the Contracting Officer in accord with the Disputes Clause of your Leases.

This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, Falls Church, Virginia 220141-3208. If you decide to make such an appeal, you must mail or otherwise furnish a written notice thereof to the Armed Services Board of Contract Appeals within ninety (90) days of the date you receive this decision. A copy thereof shall be furnished to the undersigned Contracting Officer. The notice shall indicate that an appeal is intended and shall reference this decision.

You may, solely at your election, proceed under the Armed Services Board of Contract Appeals' small claims procedure for claims of $10,000 or less or their accelerated procedure for claims of $50,000 or less.

In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action in the United States Court of Federal Claims within twelve (12) months of the date you receive this decision.

Noreen Dean Dresser
Chief, Real Estate Division
Contracting Officer